**[Cite as *180 Degree Solutions, L.L.C. v. Metron Nutraceuticals, L.L.C.*, 2021-Ohio-2769.]**

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

180 DEGREE SOLUTIONS LLC,  :

    Plaintiff-Appellant,  :

                      No. 109986

    v.  :

METRON NUTRACEUTICALS,  :
LLC, ET AL.  :
    Defendant-Appellees.  :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED IN PART AND REMANDED
**RELEASED AND JOURNALIZED:** August 12, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-888247

---

### *Appearances:*

Hahn Loeser & Parks L.L.P., Dennis R. Rose, Daniel A. DeMarco, Michael B. Pascoe, and David M. Hopkins, *for appellant.*

Lewis Brisbois Bisgaard & Smith L.L.P., Ryan K. Rubin, Greg Amend, and Daniel A. Leister, *for appellees.*

MARY J. BOYLE, A.J.:

**{¶ 1}** Plaintiff-appellant, 180 Degree Solutions, LLC ("180"), appeals from the trial court's denial of its motion for judgment notwithstanding the verdict ("JNOV") and other discovery and expert rulings after the jury returned a verdict in favor of defendants-appellees, Metron Nutraceuticals, LLC and Dr. Nikolaos Tsirikos-Karapanos. 180 raises two assignments of error for our review:

> 1. The trial court erred in its denial of Appellant's Motion for Judgment Notwithstanding the Verdict.
>
> 2. The cumulative effect of the trial court's pre-trial discovery and expert rulings against Appellant constitutes an abuse of discretion.

**{¶ 2}** Finding merit to 180's first assignment of error, we reverse and remand with instructions for the trial court to enter judgment in favor of 180 on Metron's claim for breach of contract. We overrule 180's second assignment of error.

## I. Procedure Before Trial

**{¶ 3}** In October 2017, 180 filed a complaint against Metron and its owner, Dr. Tsirikos-Karapanos, for fraud and negligent misrepresentation. The complaint stemmed from a distribution agreement entered between 180 and Metron for a nutritional supplement ("HCF-C" or "CytoDetox"). In an amended complaint before Metron and Dr. Tsirikos-Karapanos filed an answer, 180 added claims for tortious interference with business relations and breach of contract. 180 claimed that Metron and Dr. Tsirikos-Karapanos made false representations about how CytoDetox should be consumed.

{¶ 4} In January 2018, Metron and Dr. Tsirikos-Karapanos filed an answer. They also brought counterclaims against 180 and a third-party complaint against its owner, Warren Phillips, for abuse of process, breach of contract, negligent misrepresentation, tortious interference with business relations, and fraud. Metron and Dr. Tsirikos-Karapanos claimed that 180 breached various provisions of the distribution agreement, misrepresented that CytoDetox caused tongue inflammation, overstated its customer base, and engaged in fraudulent behavior.

{¶ 5} In March 2020, 180 and Phillips moved to dismiss the counts for abuse of process and fraud from the counterclaim and third-party complaint for failure to state a claim upon which relief can be granted. The trial court denied the motion, and 180 and Phillips filed an answer.

{¶ 6} In November 2018, 180 and Phillips sought leave to file a second amended complaint, which the trial court granted. 180 and Phillips added allegations that recent tests of CytoDetox showed that Metron was supplying a "minimal strength version of its product that has nowhere close to the represented dose of active ingredient[.]"

{¶ 7} Before trial, the trial court denied three of 180's motions to compel the production of documents and struck 180's expert witness for untimely disclosure. The trial court also denied 180's motions in limine to exclude reference to Phillips's business partner, testimony that 180 had violated FDA regulations, and argument that 180 breached the distribution agreement on theories not included in Metron's complaint.

**{¶ 8}** The week before trial, Metron and Dr. Tsirikos-Karapanos voluntarily dismissed their claim for tortious interference with business relations from their counterclaim and third-party complaint. 180 also dismissed its claim for tortious interference with a business relationship.

## II. Trial Procedure and Evidence

**{¶ 9}** The case proceeded to a jury trial in February 2020. In its case in chief, 180 presented Phillips and Dr. Tsirikos-Karapanos as if on cross-examination. For its case in chief, Metron presented four witnesses: Dr. Tsirikos-Karapanos, Phillips as if on cross-examination, and the videotaped deposition testimony of Erin Smith (180's former regional sales manager) and Sean Behun (180's former chief financial officer). 180 also presented Bill Labovitz (180's legal counsel) as a rebuttal witness to Behun's testimony. For clarity, we will describe the trial evidence in chronological order of the underlying events rather than the order in which each witness testified at trial.

**{¶ 10}** Dr. Tsirikos-Karapanos testified that he developed a process to create hydrolyzed clinoptilolite fragments ("HCF"), which are consumed to remove toxins from the body. He explained that Metron creates a concentrate of the fragments and sends the concentrate to contract manufacturing organizations, which dilute the concentrate with water and add vitamin C to create the final product, hydrolyzed clinoptilolite fragments with vitamin C, or "HCF-C." Dr. Tsirikos-Karapanos explained that the commercial name for HCF-C was "CytoDetox." The contract

manufacturing organizations would bottle the CytoDetox, test it pursuant to FDA regulations, and ship Metron samples with certificates of analyses for each batch.

{¶ 11} Phillips testified that Metron reached out to him to see if he would help bring CytoDetox to market. Dr. Tsirikos-Karapanos testified that Phillips and his business partner said they had a large distribution network and could reach "tens of thousands" of practitioners in the United States. 180's former regional sales manager, Erin Smith, testified that in 2015, Phillips was building the business "literally from the ground up, from ground zero."

{¶ 12} Dr. Tsirikos-Karapanos and Phillips testified that in January 2015, Metron and 180 entered the distribution agreement, which was admitted into evidence. The agreement states that 180 has the exclusive right to distribute Metron's professional strength "product" to healthcare practitioners within the United States. Appendix B to the agreement defines "product" as "Hydrolyzed Clinoptilolite Fragments (HCF)." The agreement sets forth minimum quantities that 180 must purchase to maintain its exclusive right to sell the product.

{¶ 13} The distribution agreement provides that 180 "assures" Metron that it or its affiliated entities have the "facilities, personnel, and technical expertise necessary to market the products." It also states that 180 is responsible for developing marketing materials, but 180 must obtain Metron's prior written approval before using them. The agreement states that if 180 "ceases to market and sell" HCF for Metron "for any reason," 180 and Metron "shall not use any such product name or logo/graphic unique to the Product to sell and/or market the

Product[.]"  The agreement also contains a termination clause, which provides that each party has the right to terminate the agreement "at any time for a breach of this Agreement and the failure to cure such breach within ten (10) days after written notice of such breach by a party."

{¶ 14} Phillips testified that 180 purchased CytoDetox from Metron for $13 to $15 per bottle.  He did not dispute that 180 sold CytoDetox to practitioners for roughly $45 per bottle and directly to consumers at roughly $84 per bottle.  He explained that 180 would offer a lower price per bottle depending on the volume of the purchase.

{¶ 15} Phillips testified that on December 23, 2015, Metron sent a letter to him that 180 had breached the distribution agreement by selling CytoDetox to nonpractitioners.  He testified that he sent a letter in response disputing the claim but assuring Dr. Tsirikos-Karapanos that 180 had modified its website to clarify that only practitioners were authorized to purchase CytoDetox.

{¶ 16} Dr. Tsirikos-Karapanos and Phillips testified that on April 21, 2016, Metron and 180 executed an amendment to the distribution agreement. Dr. Tsirikos-Karapanos explained that the amendment "waived" the minimum amount of product that 180 was required to sell to maintain exclusivity in 2015. Phillips testified that Metron was having financial challenges and offered a "better rate" to sell "extra inventory" with a lower concentration of HCF.  He explained the amendment was "mutually beneficial" to both parties.

{¶ 17} Phillips testified that in July 2016, he had a phone call with Dr. Tsirikos-Karapanos about selling a product to nonpractitioners. He said that he offered to purchase more CytoDetox and make it available for the public to purchase, and Dr. Tsirikos-Karapanos told him that was a "great idea" and to "sell as much as you can." Dr. Tsirikos-Karapanos denied having this phone call with Phillips.

{¶ 18} Phillips testified that on December 29, 2016, Metron sent 180 a "Notice of Breach" letter, which was admitted into evidence. The letter identifies two violations to the distribution agreement: the sale of CytoDetox to nonpractitioners and the sale of CytoDetox outside of the United States. Phillips testified that he was surprised to receive Dr. Tsirikos-Karapanos's letter, but Metron and 180 resolved the dispute by executing a second amendment to the distribution agreement. The amendment includes a release in which Metron agreed to waive any claims it had against 180 arising from 180's "unauthorized retail sales" of CytoDetox to nonpractitioners and to customers outside of the United States.

{¶ 19} Phillips testified that in early 2017, he had "calls all the time" with Dr. Tsirikos-Karapanos and that Dr. Tsirikos-Karapanos gave him permission to distribute CytoDetox outside of the United States. Phillips admitted that he did not get this authorization in writing because "he didn't know better." On March 8, 2017, Dr. Tsirikos-Karapanos sent Phillips a letter titled, "Notice to Cure Sales of CytoDetox Outside the Territory," which was admitted into evidence. The letter states that Metron does not consent to 180's sales to six practitioners outside of the

United States. Metron reminded 180 in the letter that 180 must request written consent if it wished to expand sales outside of the United States.

{¶ 20} 180's former chief financial officer, Sean Behun, testified that 180 was "selling fairly extensively at one point in Europe" and directly to customers in Canada. 180 and Phillips rebutted this testimony by calling Bill Labovitz, 180's legal counsel. Labovitz testified that after 180 terminated Behun's employment, Behun "was attempting to blackmail or engage in extortion to get $25,000 so that he would not go back to Metron and disclose to Metron what he called harmful information about 180." Labovitz testified that 180 did not pay Behun the $25,000.

{¶ 21} Phillips testified that in May 2017, 180 had shipments of CytoDetox delivered and stored in the garage of Phillips's townhouse in Pittsburg. Phillips admitted that his garage was not temperature controlled and that he "probably shouldn't have stored it in the garage" but that Dr. Tsirikos-Karapanos knew that 180 was having CytoDetox shipped to the townhouse and did not object. Dr. Tsirikos-Karapanos testified that he saw the delivery address for the CytoDetox shipments but did not know it was Phillips's townhouse.

{¶ 22} Phillips testified that in September 2017, he received a question from a Facebook group member asking if CytoDetox had ever caused tongue swelling. He said that he emailed Dr. Tsirikos-Karapanos with the question, and the email chain was admitted into evidence. In his email in response to Phillips, Dr. Tsirikos-Karapanos stated that Metron "has never received such a report" and "recommends that CytoDetox is added to a beverage and not taken orally directly." (Emphasis sic.)

Dr. Tsirikos-Karapanos testified that Phillips's email made him "jump off the ground" because he knew that tongue swelling "can be deadly." He testified that he asked 180 to investigate into the tongue-swelling incident, and he did not receive any information back from 180. Phillips testified that he did not know whether 180 investigated.

{¶ 23} Phillips and Dr. Tsirikos-Karapanos both testified that on October 6, 2017, Metron sent 180 a letter terminating the distribution agreement. Behun testified that 180's leadership was happy when Metron terminated the agreement because "they wanted to get out of" it.

{¶ 24} Phillips testified that on October 16, 2017, Metron sent 180 a letter that it had further violated the distribution agreement by publishing a brochure that contained instructions for consuming CytoDetox that were "wrong and could be dangerous." The letter was admitted into evidence and demanded that 180 immediately remove the brochure from the market and notify all its customers that the brochure contained incorrect instructions. The letter stated that if 180 did not complete the requested actions, Metron would file a lawsuit and seek injunctive relief "for the protection of the public."

{¶ 25} The brochure states the following instructions for "how to get the best results" from CytoDetox: (1) take CytoDetox in the morning and evening "on an empty stomach or 30 minutes away from food"; (2) take 10 drops "under the tongue, and swish for 30 seconds prior to swallowing"; and (3) "[w]ait 30 minutes before eating or drinking." Dr. Tsirikos-Karapanos testified that CytoDetox is not meant to

be taken under the tongue and without food or drink. He said that these instructions, combined with the question about tongue swelling, was "a huge red flag." Phillips testified that these were "always the instruction[s]" that Metron provided, but he had nothing in writing from Metron with these instructions. Dr. Tsirikos-Karapanos testified, and Phillips admitted, that 180 did not send the brochure to Metron for prior approval like the distribution agreement required.

{¶ 26} Phillips testified that after receiving Metron's letter, 180 removed the brochure from its website, but he did not remember whether 180 informed its customers that the instructions were wrong. He also stated that 180 did not respond to Metron's October 16, 2017 letter. Instead, on October 30, 2017, 180 filed its first complaint against Metron for fraud and negligent misrepresentation, alleging that Metron had misrepresented how to consume CytoDetox.

{¶ 27} Dr. Tsirikos-Karapanos stated that throughout the litigation, Metron began to sell HCF-C under the name "Clear Detox Pro," and 180 continued to sell the CytoDetox bottles it had purchased from Metron before Metron terminated the distribution agreement.

{¶ 28} Behun testified that in the spring or summer of 2017, 180 began seeking manufacturers to replace Metron's product, and Phillips testified that on May 23, 2018, 180 received its first shipment of the new product. Metron introduced into evidence a brochure showing that 180 had been marketing its new product under the name "CytoDetox." Dr. Tsirikos-Karapanos testified that 180 had been advertising its product as "molecular" clinoptilolite fragments, which he

emphasized is identical to Metron's product except for the addition of the word "molecular." Phillips testified that adding the word "molecular" was purely a marketing strategy. Phillips also said that 180's annual revenue at the time of trial was somewhere between $500,000 and $1 million dollars, and 180 had experienced sales growth every year.

{¶ 29} Dr. Tsirikos-Karapanos testified that Metron has had difficulty selling Clear Detox Pro because 180 is selling its product as CytoDetox. He explained that Metron could not find a distributor for Clear Detox Pro in 2018 or 2019. Dr. Tsirikos-Karapanos testified that the month before trial, Metron sold approximately 50 bottles of Clear Detox Pro, and Metron sold a "very small number of bottles" in 2018 and 2019. He explained that the original distribution agreement with 180 reflects that Metron had expected to sell 50,000 or 75,000 bottles of HCF-C per quarter. He testified that if he had known in 2015 what he knows now about 180, he would "never" have entered the distribution agreement with 180.

{¶ 30} Phillips testified that in the spring and summer of 2019, during this litigation, 180 hired a chemistry professor to conduct a test on Metron's version of CytoDetox. Phillips testified that the results showed there was no aluminum, silica, or vitamin C in the samples. He interpreted the test results to mean that unbeknownst to 180, Metron was selling it ionized water. He explained that 180 therefore stopped selling the rest of its supply of Metron's CytoDetox.

{¶ 31} After 180's and Phillips's case in chief, Metron and Dr. Tsirikos-Karapanos moved for a directed verdict on all claims against them, and the trial

court denied the motion. Metron and Dr. Tsirikos-Karapanos renewed their motion for directed verdict at the close of all evidence, and the trial court again denied the motion.

{¶ 32} On February 12, 2020, the jury returned a verdict in favor of Metron on its claim for breach of contract and awarded Metron $260,000 in damages. The jury also found that 180 proved its claim that Metron committed negligent misrepresentation but awarded 180 no damages. The jury found no liability for the remainder of the parties' claims. The jury awarded no punitive damages but found that an unspecified amount of attorney fees should be awarded to Metron. 180 orally moved to set aside the attorney fees, and although the record does not reflect that the trial court ruled on the motion, the trial court did not journalize the jury's award of attorney fees.

### III. Procedure After Trial

{¶ 33} In March 2020, Metron filed a motion for prejudgment interest and a motion for legal costs, expenses, and fees. The motion for legal expenses explained that the distribution agreement contained a fee-shifting provision. Metron included affidavits from its attorneys and Dr. Tsirikos-Karapanos attesting to the costs, fees, and expenses Metron incurred throughout the litigation for a total amount of $276,260.71.

{¶ 34} Also in March 2020, 180 filed a motion for JNOV. 180 requested that the trial court enter a judgment in favor of 180 on Metron's claim for breach of contract because Metron failed to introduce evidence of damages.

{¶ 35} On August 31, 2020, the trial court granted Metron's motion for prejudgment interest and denied 180's JNOV motion. In its opinion denying the JNOV motion, the trial court explained its reasoning:

> At trial, Defendants produced evidence of 180 engaging in improper non-territory sales to consumers, having insufficient temperature controlled facilities, and publicizing an unapproved brochure, which demonstrate material breaches of the [distribution] agreement. At trial, Defendants produced evidence of damages through product sales, revenue, and per unit costs.

{¶ 36} On September 1, 2020, the trial court granted Metron's motion for legal expenses.

{¶ 37} On September 28, 2020, 180 filed a notice of appeal, challenging the trial court's denial of its JNOV motion as well as the trial court's orders striking 180's expert and denying its motions to compel and motions in limine.

## IV. Judgment Notwithstanding the Verdict

{¶ 38} In its first assignment of error, 180 argues that the trial court erred in denying its JNOV motion because Metron failed to establish damages for its breach of contract claim. 180 contends that Metron did not present evidence that it suffered any damages at all. 180 further maintains that Metron admitted that its damages were speculative because during closing arguments, Metron's counsel told the jury that he would not suggest a dollar amount for damages.

{¶ 39} Civ.R. 50(B)(1), JNOV, allows a party to "serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion[.]" "If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is

reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence."  Civ.R. 50(B)(3).

{¶ 40} We review the trial court's ruling on a JNOV motion de novo. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23.  On review, "we must test whether the evidence, construed most strongly in favor of appellees, is legally sufficient to sustain the verdict."  *Id.*  Accordingly, we consider neither the weight of the evidence nor the credibility of the witnesses when undertaking this review.  *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998).

{¶ 41} To recover on a claim for breach of contract, a plaintiff must demonstrate (1) the existence of a binding contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages resulting from the breach.  *Corsaro v. ARC Westlake Village, Inc.*, 8th Dist. Cuyahoga No. 84858, 2005-Ohio-1982, ¶ 20, citing *Am. Sales, Inc. v. Boffo*, 71 Ohio App.3d 168, 175, 593 N.E.2d 316 (2d Dist.1991).  The damages must "correspond to injuries resulting from the breach."  *Corsaro* at ¶ 20.

{¶ 42} "As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort."  *Id.* at 808-809.  Damages are not uncertain merely because they cannot be calculated with absolute exactness; it

is sufficient if the evidence affords a reasonable basis for computing damages, even if the result is only an approximation. *TJX Cos., Inc. v. Hall*, 183 Ohio App.3d 236, 2009-Ohio-3372, 916 N.E.2d 862, ¶ 32 (8th Dist.). If sufficient evidence is presented from which the jury could award damages, then the jury's verdict should not be disturbed. *Fiorilli Constr., Inc. v. A. Bonamase Contracting, Inc.*, 8th Dist. Cuyahoga No. 94719, 2011-Ohio-107, ¶ 38.

{¶ 43} Ohio courts consistently recognize that recovery for breach of contract is precluded only when the existence of damages is uncertain, not when the amount is uncertain. *Woehler v. Brandenburg*, 12th Dist. Clermont No. CA2011-12-082, 2012-Ohio-5355, ¶ 35; *Fiorilli Constr.* at ¶ 36. However, to recover damages for lost profits, "the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Rhodes v. Rhodes Indus., Inc.*, 71 Ohio App.3d 797, 809, 595 N.E.2d 441 (8th Dist.1991).

{¶ 44} As an initial matter, we acknowledge that 180's argument is appropriately asserted through a JNOV motion instead of a motion for a new trial or remittitur. Metron argues that attacking the amount of damages must be raised in a motion for a new trial or remittitur because a JNOV motion attacks the jury's verdict, not its award of damages. We agree with this principle. *See Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 9, quoting *Desai v. Franklin*, 177 Ohio App.3d 679, 2008-Ohio-3957, 895 N.E.2d 875, ¶ 25 (9th Dist.) ("'Civ.R. 50(B) provides the means to challenge the jury's verdict, not the jury's award of damages.'"). However,

180 is indeed challenging the jury's verdict in finding 180 liable for breach of contract. 180 is arguing that it cannot be liable for breach of contract because Metron did not establish damages; 180 is not arguing that the jury's damages award should be a different amount.

{¶ 45} 180 argues that Metron's damages were speculative, like the damages in the case *Peltier v. McCartan*, 3d Dist. Shelby No. 17-05-14, 2005-Ohio-3901. In *Peltier*, owners of an alpaca farm brought claims against their vet for negligence and malpractice for misdiagnosing their alpaca as pregnant because they sold her as a pregnant alpaca, she never gave birth, and they had to refund the purchaser. *Id.* at ¶ 6. The owners argued that had they known the alpaca was not pregnant, they would have continued trying to breed her, and they would have been able to advertise her for mating on Alpaca.com. *Id.* at ¶ 11-12. The trial court granted summary judgment in favor of the vet because the owners' claim for monetary damages was speculative. *Id.* at ¶ 7. The Third District affirmed, finding that the misdiagnosis caused no loss in value to the alpaca itself, and there was no evidence as to what the monetary damages were. *Id.* at ¶ 12. 180 contends that Metron's damages were likewise speculative because Metron presented no evidence of the specific damages it was entitled to.

{¶ 46} 180 also points to *Lee v. Cooke*, 11th Dist. Lake No. 2018-L-045, 2019-Ohio-1163, in which Cooke and the country club he owned sued a former employee to recover funds that the former employee allegedly took from the country club. *Id.* at ¶ 2-6. The former employee testified that the funds went toward the country

club's expenses. *Id.* at ¶ 8-9. Cooke's ex-wife, "who has no golf-course experience or first-hand information as to the operation of the" golf course, testified as to which expenses "she thought may or may not be necessary to operation of a golf course." *Id.* at ¶ 9. Cooke himself also testified that he had no "exact numbers" that he claimed that the former employee took that should have belonged to the country club. *Id.* at ¶ 19-21. The trial court granted the former employee's motion for directed verdict for Cooke's failure to establish damages. *Id.* at ¶ 10. On appeal, Cooke argued that the jury should have been allowed to determine the issue of damages. *Id.* at ¶ 15. The Eleventh District affirmed the trial court's judgment, finding that Cooke's testimony failed to establish damages, and his ex-wife's testimony as to which expenses were for the golf course "was pure speculation." *Id.* at ¶ 15-17. 180 draws a comparison between Cooke's testimony that he had no "exact numbers" and Metron's counsel's decision to "never" ask Dr. Tsirikos-Karapanos how much Metron was "financially harmed."

{¶ 47} Metron argues that *Cooke* is distinguishable because it involved a directed verdict instead of a JNOV motion, and although the court in *Cooke* could consider only the plaintiff's evidence, we must consider all the evidence presented at trial. This is a distinction without a difference in this case because even looking at all the evidence presented at trial in the light most favorable to Metron, there is no evidence showing that Metron incurred damages. Metron also contends that *Cooke* "attempted to distinguish a substantive split" between the Eighth and Eleventh Districts by noting that once the fact of damage is established with

reasonable certainty, the plaintiff has latitude to prove the amount of the loss. We recognize that *Cooke* cites an Eighth District case for this proposition of law, but there is no discussion or acknowledgement of a district split on this issue. Lastly, Metron points out that *Cooke* is from the Eleventh District and has never been cited. We acknowledge that *Cooke* is not binding authority, but we find it persuasive.

{¶ 48} Metron identifies the following evidence to support its award for damages:

- Dr. Tsirikos-Karapanos testified that Metron would have never entered the agreement with 180 if it knew how 180 would conduct itself.

- 180 developed its own product, stockpiled Metron's product to sell in the meantime, and failed to notify Metron of its plans.

- At the time it entered into the Agreement, 180 was a[t] "ground zero" with respect to product sales. But by 2017, 180's annual revenue had grown to $562,000, and CytoDetox was its "best seller."

- 180 paid Metron $13 per bottle of CytoDetox and sold them to customers at $45-$84 per bottle.

- After the termination of the distribution agreement, 180 sold at least 6,700 bottles of Metron's product in 2018.

- 180's revenue has "definitely" increased in the years following the termination, totaling nearly $1 million in 2019.

- After the agreement termination, Metron was unable to find a new distributor and saw a "dramatic decline" in its sales volume.

{¶ 49} Metron maintains that 180 did not object to the jury instruction regarding contract damages or the lack of jury interrogatories, and we must

therefore presume that the jury followed the instruction.  The instruction stated as follows:

> The law provides that a person who has been damaged by a breach of contract shall be fairly and reasonably compensated for his or her loss. In determining the damages, if any, you will allow an amount that will reasonably compensate the injured person for all losses that are the natural and probable result of the breach.

Metron emphasizes that 180 did not request, and the trial court did not submit, special jury interrogatories that would have differentiated between the types of damages the jury was awarding or the theories of breach.  Metron points out that we therefore do not know whether the jury awarded damages for 180's non-territory sales to consumers or for publicizing an unapproved brochure, for example, or how it calculated its award.  Metron maintains that 180 is therefore limited to challenging the jury's verdict "as a whole."

{¶ 50} Jury interrogatories to clarify how the jury reached its damages award would have certainly been helpful to "'test the correctness of the general verdict returned.'"  *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 613-614, 635 N.E.2d 310 (1994), quoting *Bradley v. Mansfield Rapid Transit, Inc.*, 154 Ohio St. 154, 160, 93 N.E.2d 672 (1950).  But the lack of jury interrogatories on this topic and 180's lack of objection do not prevent us from reviewing whether Metron produced evidence of damages at all.  *See Bobb Forest Prods. v. Morbark Indus.*, 151 Ohio App.3d 63, 2002-Ohio-5370, 783 N.E.2d 560, ¶ 63-64 (7th Dist.) (reviewing each specific ground upon which the jury could have based its award in the absence of

jury interrogatories differentiating between the types of damages the jury was awarding).

{¶ 51} In this case, the lack of jury interrogatories differentiating between the theories of breach is inconsequential because Metron produced no evidence that any of 180's breaches of the distribution agreement caused it to incur damages. "A claimant seeking to recover for breach of contract must show damage as a result of the breach. Damages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach." *Corsaro*, 8th Dist. Cuyahoga No. 84858, 2005-Ohio-1982, at ¶ 20 (finding plaintiff had not proven contract damages because the injury was "not the natural consequence" of the breach).

{¶ 52} Metron produced no evidence that it suffered any damages arising from 180's sales outside of the United States, sales to nonpractitioners, failure to maintain appropriate facilities and personnel, publication of the brochure without prior approval, or continued use of the name "CytoDetox" to sell its own product after the termination of the distribution agreement. Metron produced no evidence, for example, that practitioners stopped purchasing CytoDetox because of allegedly faulty instructions in the brochure, or that Metron lost a particular relationship with another distributor due to 180's international sales or sales directly to consumers. Although Metron produced testimony that it could not find a new distributor for its Clear Detox Pro, and Dr. Tsirikos-Karapanos thought that was because 180 continued to use the name CytoDetox, Metron produced no evidence of specific

distributors with which it tried to do business and no evidence that those distributors refused to sell Metron's Clear Detox Pro because of 180's continued use of the name CytoDetox.

{¶ 53} Metron does not explicitly state that 180's breaches of the distribution agreement caused Metron to lose profits. But to the extent Metron makes such an argument, it lacks merit. Even if Metron established that it suffered some amount of lost profits as a result of 180's breaches of the distribution agreement, Metron produced no evidence as to what its lost profits might be. *See Blain's Folding Serv. v. Cincinnati Ins. Co.*, 2018-Ohio-959, 109 N.E.3d 177 (8th Dist.) (holding that the plaintiff failed to adequately prove its damages for lost profits because it "failed to offer any evidence of what those lost profits might be.") *Id.* at ¶ 18. To establish lost profits, Metron must produce more than a "conclusory statement" and must explain "how that sum was determined." *Rhodes*, 71 Ohio App.3d 797, at 809, 595 N.E.2d 441. "Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." *Id.* Metron points to the evidence of 180's revenue growth, but evidence of 180's revenue is not evidence of Metron's lost profits. Metron produced no testimony or expert report to establish an amount of lost profits. Metron does not purport to explain how to calculate lost profits, and its counsel in closing arguments specifically told the jury that the "dollar figures are for you-all to decide. I'm not going to suggest them." *See MADFAN, Inc. v. Makris*, 2017-Ohio-979, 86 N.E.3d 707 (8th Dist.) (lack of evidence to support a

damages award was further shown "by the fact that plaintiffs' counsel could not even offer a number or method of calculating damages during closing argument").

{¶ 54} Accordingly, we find that Metron failed to establish with reasonable certainty that it suffered damages from any of 180's breaches of the distribution agreement. Although Metron may have established (1) the existence of a binding contract, (2) performance by Metron, and (3) breach by 180, without evidence of damages resulting from the breach, Metron has failed to establish a claim for breach of contract. We find that the trial court therefore erred in denying 180's JNOV motion. We sustain 180's first assignment of error.

## V. Pretrial and Trial Rulings

{¶ 55} In its second assignment of error, 180 requests a new trial on its claims against Metron. 180 argues that the cumulative effect of many of the trial court's rulings before and during trial "constituted abuse of discretion" and deprived 180 of a fair trial. Specifically, 180 challenges the trial court's denial of three motions to compel discovery, exclusion of an expert witness, limitation of Phillips's testimony to his personal knowledge, and denial of three motions in limine.

{¶ 56} Under the cumulative-error doctrine, a judgment can be reversed when the cumulation of errors prevents a fair trial even if each individual error alone does not justify reversal. *Daniels v. Northcoast Anesthesia Providers, Inc.*, 2018-Ohio-3562, 120 N.E.3d 52, ¶ 66 (8th Dist.2018).

{¶ 57} We review a trial court's decisions regarding discovery matters, motions in limine, and the admissibility of expert testimony for abuse of discretion.

*Penix v. Avon Laundry & Dry Cleaners*, 8th Dist. Cuyahoga No. 91355, 2009-Ohio-1362, ¶ 30 ("It is well established that a trial court enjoys considerable discretion in the regulation of discovery proceedings."); *Halenar v. Ameritech-Ohio SBC/Ameritech*, 8th Dist. Cuyahoga No. 94976, 2011-Ohio-2030, ¶ 28 ("A trial court's determination of the admissibility of expert testimony * * * [and] a trial court's ruling on a motion in limine is left to the sound discretion of the trial court."). An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Ruwe v. Bd. of Twp. Trustees*, 29 Ohio St.3d 59, 61, 505 N.E.2d 957 (1987). "Appellate courts should defer to trial judges, who witnessed the trial firsthand and relied upon more than a cold record to justify a decision." *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, ¶ 36.

{¶ 58} We address 180's arguments separately regarding the motions to compel, expert rulings, and motions in limine.

### A. Motions to Compel Discovery

{¶ 59} 180 argues that the trial court abused its discretion in denying its three motions to compel Metron to produce certain categories of documents, including documents related to a settlement in a different lawsuit, Metron's internal communications about HCF concentrate, and the results of Metron's internal testing of the HCF concentrate and HCF-C final product. 180 contends that the denials of the motions to compel prevented it from presenting "a considerable amount of evidence" and prejudiced it at trial.

**{¶ 60}** "'Ohio has a liberal discovery policy which, subject to privilege, enables opposing parties to obtain from each other all evidence that is material, relevant and competent, notwithstanding its admissibility at trial.'" *Nemcek v. Northeast Ohio Regional Sewer Dist.*, 8th Dist. Cuyahoga No. 98431, 2012-Ohio-5516, ¶ 8, quoting *Fletcher v. Nationwide Mut. Ins. Co.*, 2d Dist. Darke No. 02CA1599, 2003-Ohio-3038, ¶ 14, citing Civ.R. 26(B)(1). While discovery should be liberally allowed, a trial court is vested with broad discretion in discovery matters. *Roe v. Planned Parenthood S.W. Ohio Region*, 122 Ohio St.3d 399, 2009-Ohio-2973, 912 N.E.2d 61, ¶ 82. Notwithstanding Ohio's liberal discovery provisions, a trial court is vested with the authority to limit pretrial discovery to prevent an abuse of the discovery process. *Arnold v. Am. Natl. Red Cross,* 93 Ohio App. 3d 564, 575, 639 N.E.2d 484 (8th Dist.1994).

### 1. Documents Related to Prior Litigation

**{¶ 61}** In May 2019, 180 subpoenaed LifeHealth Science, a lab where Dr. Tsirikos-Karapanos worked before he created Metron. 180 sought a settlement agreement from litigation between LifeHealth Science and Metron in 2014, communication leading to the settlement, and all documents relating to the ownership and development of HCF-C. 180 then broadened the request to the entire case file to "reduce the burden" so that LifeHealth Science would not need to sort through the documents itself. Metron filed a motion to quash the subpoena, explaining that as part of the settlement, the owner of LifeHealth Science executed an affidavit stating that LifeHealth Science "does not contest Dr. Tsirikos-

Karapanos's ownership and rights to any and all patents filed and/or issued as of the date of this affidavit and any rights emanating therefrom." 180 then filed a motion to compel the documents from either Metron or LifeHealth Science.

{¶ 62} The trial court held a hearing on the matter, and in a later judgment entry, the trial court granted Metron's motion to quash the subpoena and denied 180's motion to compel. In the detailed judgment entry, the trial court explained that the current case between 180 and Metron involves the "alleged representations in marketing and instruction for use of the product, the alleged concentration of the product supplied, and the alleged breaches of the [distribution] agreement." The trial court continued that neither party raised a claim about "the ownership or patent rights of the product or Metron's ability to sell its product." The trial court concluded that, therefore, the documents 180 sought "are irrelevant to this matter, unduly burdensome, and require[] disclosure of privileged or otherwise protected matter pursuant to Civ.R. 45(C)(3)."

{¶ 63} Civ.R. 26(B)(1) provides that, in general, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" 180 sought discovery regarding the ownership of HCF-C, but its claims were based on allegations regarding misrepresentations of how to consume CytoDetox and the concentration of HCF in CytoDetox. 180 did not allege in its complaint that the distribution agreement was void because Metron did not own HCF-C. Therefore, we find that the trial court did not abuse its discretion when it precluded 180 from obtaining discovery irrelevant

to its claims. *See Janezic v. Eaton Corp.*, 8th Dist. Cuyahoga No. 99897, 2013-Ohio-5436, ¶ 16 (holding trial court did not abuse discretion where the plaintiff sought discovery that had no relevance to his claims).

### 2. Internal Communications and Testing

{¶ 64} In August 2019, 180 filed a motion to compel Metron to provide a "forensic image of [its] internal computers and a harvest of all e-mails for both the professional and personal accounts" of Metron's employees. 180 argued that after taking depositions, it had proof that Metron withheld a "substantial number" of relevant documents, including "testing of the HCF-C concentrate," testing of the finished CytoDetox product, and "electron scanning microscopy testing." 180 maintained that Metron could not be trusted to produce documents responsive to 180's discovery requests, and forensic imaging of their computers and an email "harvest" is warranted. After briefing, the trial court denied 180's motion, explaining that it "weighed and considered the significant privacy and confidentiality concerns inherent in imaging against the utility or necessity of the imaging." But the trial court stated in its judgment entry that "if discovery disputes remain, the parties may file motions to compel for any specific and clearly defined items for production."

{¶ 65} In September 2019, 180 filed another motion to compel, identifying six categories of documents: (1) testing results of Metron's HCF concentrate, (2) results of electron microscopy testing of HCF and HCF-C, (3) internal Metron correspondence regarding HCF and HCF-C, (4) communications between Metron

and third parties relating to 180 or Phillips, (5) documents relating to Metron's claims for breach of contract and tortious interference, and (6) correspondence between Metron and 180's former CFO, Sean Behun. In its appellate brief, 180 argues that the most important documents were those relating to "internal testing of concentration" because they directly related to 180's allegations that CytoDetox did not contain the "critical amount" of the active ingredient.

{¶ 66} In its opposition to 180's motion to compel, and again in its appellate brief, Metron argued that 180 never sought in its discovery requests documents relating to the testing of the HCF concentrate. Metron highlighted the distinction between the HCF concentrate that it produces in its lab and the bottles of CytoDetox that the contract manufacturing organizations create by adding water and vitamin C to the HCF concentrate. Metron maintained that electron microscopy testing was performed only on the HCF concentrate, not on the HCF-C final product. Regarding communications, Metron claimed that the requests for "all communications" were too broad, it already produced "specifically responsive" communications, it stipulated it would not contest the authenticity of emails from 180, and it has not challenged 180's subpoenas to Metron's contract manufacturing and research organizations. The trial court denied 180's motion to compel without opinion.

{¶ 67} The trial court did not abuse its discretion in denying these motions to compel. As an initial matter, 180 does not argue on appeal that the trial court erred by refusing to order an imaging of Metron's computers and harvesting Metron's email. Regarding the test results for the HCF concentrate, a review of 180's

discovery requests shows that 180 never requested documents related to the testing of HCF concentrate. Instead, 180 requested documents relating to "HCF-C" or "CytoDetox." 180 does not dispute this and implies that such a request includes the HCF concentrate. But the test results for the finished product — not the HCF concentrate — would be the documents relevant to 180's allegations that CytoDetox does not contain any HCF concentrate and is instead simply ionized water. Metron's test results for the HCF concentrate would be meaningless if, as 180 claims, the concentrate was not actually in the finished CytoDetox product. Furthermore, given Metron's representation that it produced all relevant communication, combined with the additional documents 180 obtained directly from Metron's contract manufacturing and research organizations, we find that the trial court's decisions to deny these motions to compel were not unreasonable, arbitrary, or unconscionable.

## B. Expert Rulings

{¶ 68} Next, 180 argues that the trial court erred when it excluded its expert, Dr. Ball, and refused to qualify Phillips as a party expert.

### 1. Exclusion of Dr. Ball

{¶ 69} 180 argues that the trial court abused its discretion by striking the proposed testimony and expert report of Dr. Ball, who would have testified that he designed a procedure to test the amount of HCF in CytoDetox samples, that he secured a facility (Jordi Labs) to run the test, and that the test results show that the CytoDetox samples contained only a "miniscule fraction" of HCF. 180 contends that cases should be decided on their merits, and the trial court's decision to strike the

expert report for being untimely prevented the jury from considering highly probative evidence. 180 also argues that the expert-disclosure deadline became moot when the trial court later continued the trial date by several months.

{¶ 70} "Trial courts have broad discretion in managing their dockets, setting case schedules and imposing discovery sanctions for violations of court rules and scheduling orders, including the exclusion of expert witnesses who are not timely disclosed." *Sonis v. Rasner*, 2015-Ohio-3028, 39 N.E.3d 871, ¶ 40 (8th Dist.2015). Cuyahoga County Common Pleas Court Loc.R. 21.1 Part(I)(A) provides in relevant part that parties "shall submit expert reports in accord with the time schedule established at the Case Management Conference. Upon good cause shown, the Court may grant the parties additional time within which to submit expert reports." Furthermore, pursuant to Part(I)(B) of this rule, "unless good cause is shown, all supplemental [expert] reports must be supplied no later than thirty (30) days prior to trial."

{¶ 71} On August 17, 2018, the trial court extended the deadline for the parties to submit expert reports. The order imposed a deadline for 180 and Phillips to disclose expert reports by October 31, 2018. 180 and Phillips did not object to this deadline or at any point request a continuance or extension. But on August 1, 2019, 180 and Phillips filed an amended pretrial statement that disclosed for the first time Dr. Ball as an expert witness. The amended pretrial statement provides that they will call Dr. Ball and "a representative of Jordi Labs LLC to provide expert testimony regarding the information contained in Dr. Ball's and Jordi Labs' expert reports,"

which were being submitted separately. This filing was 9 months after the deadline to disclose expert reports and less than 30 days before the scheduled trial. Metron and Dr. Tsirikos-Karapanos moved to strike the experts, and the trial court granted the motion because 180 and Phillips produced the experts after the deadline, "failed to seek an extension of time to produce an expert," and produced the experts only 20 days before trial.

{¶ 72} 180 cites to *Booker v. Revco DS, Inc.*, 113 Ohio App.3d 540, 544, 681 N.E.2d 499 (8th Dist.1996), for the proposition that when an expert report requires results from an independent laboratory and the testing will take 60 days, the trial court abuses its discretion in not extending the expert deadline to allow the testing and report. 180 contends that, like in *Booker*, Dr. Ball's expert report was late because of a delay in getting subpoena responses necessary to conduct the testing and the need to secure a lab. However, the plaintiff in *Booker* moved for an extension of time to file an expert report, and the Eighth District found that the trial court abused its discretion in not granting the extension. But 180 did not file a motion for extra time. If 180 anticipated delays in obtaining subpoena response and the lab-testing process, it should have alerted the court ahead of time and sought an extension.

{¶ 73} We are not persuaded by 180's argument regarding the trial court continuing the trial date. A trial court has discretion to continue a trial date without also continuing the deadline for disclosing expert witnesses. *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged,* 15 Ohio St.3d 44, 472 N.E.2d 704 (1984) ("The

subsequent postponement of the trial date did not lead to a reasonable presumption that the filing deadline was extended as well."); *see also Cox v. Greene Mem. Hosp.*, 2d Dist. Greene No. 2000-CA-46, 2000 Ohio App. LEXIS 3942, 9-10 (Sept. 1, 2000) (The plaintiff "acknowledged that it would have been within the trial court's discretion to continue the trial date without also continuing the deadline for disclosing expert witnesses."). Given 180's delay in producing Dr. Ball as an expert and failure to seek an extension of time, we find that the trial court did not abuse its discretion when it continued the trial date but did not extend the expert deadlines.

{¶ 74} After reviewing the record, we find that the trial court acted within the wide range of its discretion and was not unreasonable, arbitrary, or unconscionable in striking 180's untimely expert disclosure.

### 2. Limitation of Phillips's Testimony

{¶ 75} 180 also argues that the trial court erred in preventing Phillips from testifying about the contents of Dr. Ball's expert report and in refusing to qualify Phillips as an expert himself.

{¶ 76} On January 28, 2020, Metron filed a motion in limine to prevent Phillips from testifying about the contents of Dr. Ball's report, citing to 180's trial brief in which 180 stated that "there is nothing that prevents Warren Phillips from testifying to these facts [that CytoDetox lacked clinoptilolite]." The trial court granted the motion, explaining that objections to Phillips's testimony may be made at trial but that Phillips "is precluded from testifying as to the data and opinions contained in the report as he did not conduct the testing nor did he author the

report." 180 first contends that the trial court abused its discretion in granting this motion in limine because it was untimely. 180 also argues that the exclusion of expert witnesses pursuant to a motion in limine can be reversible error, citing to *Brannon v. Austinburg Rehab. & Nursing Ctr.*, 190 Ohio App.3d 662, 2010-Ohio-5396, 943 N.E.2d 1062 (11th Dist.2010), and *Estate of Thompson v. Club Car, Inc.*, 5th Dist. Richland No. 2009-CA-0120, 2010-Ohio-2593.

{¶ 77} We disagree with these arguments. A trial court has discretion to grant an untimely pretrial motion. *McGowan v. Cuyahoga Metro. Hous. Auth.*, 8th Dist. Cuyahoga No. 79137, 2001 Ohio App. LEXIS 3699, 4 (Aug. 23, 2001). And *Brannon* and *Estate of Thompson* do not stand for the principle that it is reversible error to exclude an expert witness via a motion in limine. In *Brannon*, the trial court erred in granting a motion in limine to exclude an expert witness because the trial court applied the wrong qualification standards. *Id.* at ¶ 19. In *Estate of Thompson*, the trial court erred in granting a motion to exclude an expert witness because the witness's testimony complied with Evid.R. 702(C).

{¶ 78} 180 also argues that the trial court erred in not qualifying Phillips as an expert. Evid.R. 702 states:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 79} At trial, Phillips testified that he double majored in environmental science and geology in college, he has a master's degree in geology, and he pursued a thesis in aqueous chemistry, which he described as "sediment interaction of heavy metals and aqueous environment in the sediments in a coal mine pit lake." He said he spent time in a lab in the geology department analyzing "low level metal," where he conducted an "acqua regia microwave digestion" that would break down the contents of a water sample to allow for measurement at "very low levels in the ICP mass spectrophotometer." He testified that he ran a microwave digestion over one hundred times and spent over 500 hours running the ICP mass spectrophotometer and analyzing water samples. He also worked "cleaning up the hazardous waste for U.S. Forest Service, Army Corps of Engineers, Bureau of Land Management." In this role, he used mass spectrometry to analyze soil samples to "figure out how many heavy metals were in the soil."

{¶ 80} At trial, after this testimony, 180's counsel asked the trial court to qualify Phillips as an expert in chemistry, "specifically the analysis of samples for the

presence of heavy metals using microwave digestion and ICP mass spectrometry."
Metron's counsel objected, and the parties presented argument out of the jury's
presence about whether Phillips was qualified to testify regarding the results of the
microwave digestion tests that Dr. Ball designed to analyze the CytoDetox samples.
After considering extensive arguments that afternoon and the following morning,
the trial court declined to qualify Phillips as an expert. The trial court explained that
Phillips did not design or conduct the test and therefore could not be examined
about the test process and whether the test was conducted properly. The trial court
ordered that Phillips could not testify to the contents of Dr. Ball's report but that he
could testify to his personal knowledge and how he reached the conclusion that he
believes CytoDetox is simply ionized water.

{¶ 81} After reviewing the record, we find that the trial court's decision to
limit Phillips's testimony to his personal knowledge was not unreasonable,
arbitrary, or unconscionable. 180 cites to cases to show that relevant college
experience is sufficient to qualify someone as an expert witness. But the trial court
did not base its decision on Phillips's lack of education. Rather, the problem was a
lack of foundation. Although Phillips spent time in graduate school running the
types of tests that Dr. Ball conducted, Phillips did not design or conduct the tests on
the CytoDetox samples. He could not be examined to establish the reliability of the
test design or whether the test "was conducted in a way that [would] yield accurate
results." Evid.R. 702(C)(3). Accordingly, the trial court did not abuse its discretion

in refusing to qualify him as an expert and in prohibiting him from testifying about the details of the test and the contents of Dr. Ball's report.

## C. Motions in Limine

{¶ 82} Lastly, 180 argues that the trial court abused its discretion when it denied 180's motions in limine to exclude reference to Pompa and his criminal record, to preclude testimony about 180's lack of compliance with FDA regulations, and to prevent Metron from arguing that 180 breached the distribution agreement based on theories not included in Metron's complaint.

### 1. FDA Regulations Violations and Unpled Bases for Breach of Contract

{¶ 83} 180's motions to exclude testimony about its failure to comply with FDA regulations and to prevent Metron from arguing unpled bases for breach of contract are based on related concepts, so we will address them together. In December 2019, 180 filed its motion to exclude reference to alleged violations of FDA regulations, arguing that the issue is irrelevant and calls for legal conclusions, and such testimony would unfairly prejudice 180. The trial court denied the motion before trial. During trial, 180 filed a motion to prevent Metron from arguing "[unpled] breach of contract claims." In this motion, 180 argued that Metron was advancing a theory that 180 breached the distribution agreement because it violated FDA regulations and was unqualified to sell CytoDetox, but Metron did not allege this theory for breach of contract in its complaint. The parties presented argument on this motion the next morning out of the presence of the jury, and the trial court

denied the motion. 180 contends that the trial court abused its discretion when it denied both motions.

{¶ 84} Ohio law is clear "that a ruling on a [pretrial] motion in limine may not be appealed and that objections to the introduction of testimony or statements of counsel must be made during the trial to preserve evidentiary rulings for appellate review." *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34; *see also U.S. Bank v. Amir*, 8th Dist. Cuyahoga No. 97438, 2012-Ohio-2772, ¶ 26 ("[A] ruling on a motion in limine may not be appealed unless the claimed error is preserved by an objection made during trial."). This is because a "trial court's ruling on a motion in limine is tentative and precautionary in nature," and the trial court "is at liberty to change its ruling on the disputed evidence at trial." *U.S. Bank* at ¶ 26.

{¶ 85} The record shows that 180 did not properly preserve its challenge to the trial court's denial of these motions in limine. During the presentation of evidence at trial, 180 did not object to any of the testimony about whether 180 complied with FDA regulations. 180 has thus waived all but plain error. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 133 (defense waived all but plain error when it did not renew its objections at trial after its motion in limine). Plain errors are those that prejudice the appellant and that "are clearly apparent on the face of the record." *Wells Fargo Bank, N.A. v. Lundeen*, 8th Dist. Cuyahoga No. 107184, 2020-Ohio-28, ¶ 12. Courts reviewing plain error in civil

cases "must proceed with the utmost caution." *Risner v. Ohio Dept. of Natural Resources*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27.

**{¶ 86}** As to the trial court's denial of 180's pretrial motion to exclude testimony about alleged FDA violations, 180 argues that Dr. Tsirikos-Karapanos's opinions about 180's lack of FDA compliance severely prejudiced 180 and were improper because lay witnesses cannot testify to legal conclusions. Specifically, 180 challenges Dr. Tsirikos-Karapanos's statement that he would not have entered the distribution agreement with 180 if he knew 180 "did not have any FDA compliance officers in their company or any affiliated company." While we do not dispute the principle that lay witnesses may not offer legal conclusions, the trial transcript reflects that Dr. Tsirikos-Karapanos spoke generally about his impression of 180's operations based on his personal knowledge. 180 points to no testimony where a witness specifically stated that 180 violated a particular FDA regulation. We can identify no error clearly apparent on the face of the record.

**{¶ 87}** Turning to the trial court's denial of 180's motion to prevent Metron from arguing breach of contract based on 180's supposed violations of FDA regulations, we likewise find no plain error. Although the jury found that 180 breached the distribution agreement, the record does not reveal the specific basis for this finding. We cannot determine from the record whether the jury concluded that 180 breached the agreement because it found that 180 sold CytoDetox outside the United States, that 180 did not obtain Metron's approval for the contested brochure, or that 180 violated FDA regulations. The jury could have relied on a

combination of these findings or another finding altogether, and the record does not show that the jury found breach of contract because it found that 180 violated FDA regulations. Accordingly, it is not apparent on the face of the record that Metron's argument that 180 breached the agreement because it violated FDA regulations prejudiced 180. We therefore find no plain error.

### 2. Pompa Conviction

{¶ 88} 180 also argues that the trial court abused its discretion in denying its motion in limine to exclude testimony about a criminal conviction of Phillips's business partner, Dan Pompa. At trial, Metron's counsel elicited testimony from Phillips that Pompa pleaded guilty to "stealing $1.4 million from orphans." On redirect examination, Phillips explained that Pompa and his wife adopted two children of their close friends when the friends were killed. He said that the children had a trust, and he agreed that the Pompas "accepted responsibility that what they had done with the funds was wrong." He stated that the Pompas are paying restitution, and the children are still living with them. Dr. Tsirikos-Karapanos later testified, twice, that he would not have trusted 180 if he knew that Pompa "stole money from seven-year-old orphans." 180 contends that this evidence is irrelevant to the case and highly prejudicial, and Pompa was not a witness at trial.

{¶ 89} Metron argues that 180 waived its challenge to the trial court's denial of this motion in limine because it did not object to Dr. Tsirikos-Karapanos's statements. However, the trial transcript reflects that 180's counsel did object to the

introduction of evidence of Pompa's conviction when Metron's counsel first introduced it:

| | |
|---|---|
| Metron's Counsel: | In terms of credibility for the business and helping sales, does pleading guilty to stealing $1.4 million from orphans — |
| 180's Counsel: | Objection. Sidebar, your Honor? |
| The Court: | Overruled. |
| Metron's Counsel: | Does Dan Pompa pleading guilty to stealing $1.4 million from orphan children affect your sales or credibility? |
| Phillips: | I can't say sales, but credibility for sure. |

Accordingly, 180 preserved its challenge to this evidence, and we review its admission for abuse of discretion.

{¶ 90} Pursuant to Evid.R. 402, "[e]vidence which is not relevant is not admissible." Evid.R. 403(A) states that, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 91} The relevancy of Pompa's conviction is questionable. Metron contends that Pompa's conviction is relevant to the credibility of Phillips, who chose to do business with Pompa, and to 180's failure to have appropriate personnel. But Pompa was not a party to this lawsuit and was not a witness at trial, so his credibility was not at issue. And the characterization of "stealing from orphans" is certainly highly prejudicial. We find that the danger of unfair prejudice substantially outweighed the probative value of the evidence of Pompa's conviction. We therefore

find that the trial court abused its discretion in allowing evidence of Pompa's criminal conviction.

{¶ 92} However, this is the only error we have identified in the trial court's rulings. The cumulative error doctrine does not apply where, as here, "there have not been multiple errors." *O'Malley v. O'Malley*, 8th Dist. Cuyahoga No. 98708, 2013-Ohio-5238, ¶ 95; *see also Snell v. Snell*, 5th Dist. Richland No. 13CA80, 2014-Ohio-3285, ¶ 64 ("[W]e do not find the [cumulative error] doctrine applicable here where there have not been multiple errors.").

{¶ 93} Accordingly, we find that the cumulative error doctrine does not apply here, and 180 is not entitled to a new trial on its claims against Metron. We therefore overrule 180's second assignment of error.

{¶ 94} The trial court's judgment on 180's motion for judgment notwithstanding the verdict is reversed and remanded with instructions for the trial court to enter judgment in favor of 180 on Metron's claim for breach of contract. As Metron has not succeeded on any of its claims against 180, we also vacate Metron's awards of prejudgment interest and legal costs, expenses, and fees.

It is ordered that appellant recover from appellees the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, ADMINISTRATIVE JUDGE

KATHLEEN ANN KEOUGH, J., and
EILEEN A. GALLAGHER, J., CONCUR