[Cite as *Yeckley Ents., Inc. v. Huntington Natl. Bank*, 2024-Ohio-5812.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

YECKLEY ENTERPRISES, INC.,　　　　:

　　　Plaintiff-Appellant,　　　:　　　　No. 113828

　　　v.　　　　　　　　　　　　:

THE HUNTINGTON NATIONAL　　　:
BANK,

　　　Defendant-Appellee.　　　:

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 12, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-23-980525

---

### *Appearances:*

CRK Law, LLC and Ricardo J. Cardenas, *for appellant.*

Perez & Morris LLC, Kerin Lyn Kaminski, Karen L. Giffen,
and Jo A. Tatarko, *for appellee.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1}  Plaintiff-appellant, Yeckley Enterprises, Inc. ("Yeckley Enterprises"), appeals the trial court's order granting summary judgment in favor of defendant-appellee, The Huntington National Bank ("Huntington"), on its breach-of-contract and negligence claims arising out of Huntington's unauthorized change of mailing

address on Yeckley Enterprises' bank accounts.  Yeckley Enterprises contends that the trial court erred in granting summary judgment in favor of Huntington because there are genuine issues of material fact as to whether (1) Huntington breached the account agreement, (2) Huntington breached a duty of ordinary care owed to Yeckley Enterprises and (3) Yeckley Enterprises sustained damages as a result of Huntington's alleged breach of contract and negligence.

{¶ 2}    For the reasons that follow, we affirm.

**Procedural and Factual Background**[1]

{¶ 3}    Yeckley Enterprises was incorporated in or around 2001 for the purpose of owning and operating The Bench Lounge, a local tavern.  Dennis Yeckley ("Dennis") was the president and owner of Yeckley Enterprises.  The address for The Bench Lounge was 26594 Lakeshore Blvd., Euclid, Ohio 44132 (the "Lakeshore Blvd. address").  Dennis resided at 271 East 270th St. in Euclid, Ohio (the "E. 270th St. address").  Yeckley Enterprises used the E. 270th St. address as its mailing address.

{¶ 4}    Yeckley Enterprises sold The Bench Lounge in 2018.  Shortly thereafter, the buyer moved the bar to a new location and changed the name.  Following the sale of The Bench Lounge, the business of Yeckley Enterprises was

---

[1] The facts set forth herein are based on the admissions in Huntington's answer and the documents submitted by the parties in support of and opposition to Huntington's motion for summary judgment.

solely to collect payments from the sale. Dennis testified that neither he nor Yeckley Enterprises had any connection to the Lakeshore Blvd. address after the sale.

{¶ 5} From approximately June 2020 until April 2022, Yeckley Enterprises held a checking account and a savings account with Huntington (the "accounts"). When the accounts were opened, the E. 270th St. address was listed as the mailing address for Yeckley Enterprises. From June 2020 through August 2020, monthly bank statements and other account documents were mailed to, and received by, Yeckley Enterprises at the E. 270th St. address.

{¶ 6} In September 2020, Ashley Phebus, a customer due diligence investigator for Huntington inadvertently changed the mailing address on Yeckley Enterprises' accounts from the E. 270th St. address to the Lakeshore Blvd. address.[2] Yeckley Enterprises never requested, nor authorized, Huntington to change the mailing address on its accounts.

{¶ 7} On September 17, 2020, Huntington sent a notice to Yeckley Enterprises at the E. 270th St. address captioned "Important Information about Your Change of Address." The notice stated, in relevant part:

> Please note that a change of address has recently been made on one or more of your Huntington accounts. You may have requested the

---

[2] In an affidavit submitted with Huntington's motion for summary judgment, Phebus stated that she contacted Dennis and requested address information for Yeckley Enterprises in connection with a customer due diligence investigation she was conducting. She stated that Dennis told her that he operated Yeckley Enterprises out of his home. Nevertheless, determining that Yeckley Enterprises had been associated with The Bench Lounge and the Lakeshore Blvd. address, Phebus added the Lakeshore Blvd. address to Yeckley Enterprises' accounts, listing it as the "physical address" for Yeckley Enterprises. At that time, the mailing address on the accounts was also inadvertently changed to the Lakeshore Blvd. address.

change yourself, or we may have obtained updated information from the U.S. Postal Service.

. . . If you did not authorize a change of address, or if the address is incorrect, please contact us as soon as possible to ensure that the address information we have on file for you is complete and accurate.

{¶ 8} During his deposition Dennis testified that he could not recall whether he received the September 17, 2020 change-of-address notice. In an affidavit submitted with Yeckley Enterprises' opposition to Huntington's motion for summary judgment, Dennis stated that "[n]o notices from Huntington were ever received at the Proper Address [the E. 270th St. address] to confirm that Huntington had changed the [mailing] addresses [for] statements . . . for the Accounts to the Improper Address [the Lakeshore Blvd. address]."

{¶ 9} The statements for activity in September 2020 through May 2021, were mailed to Yeckley Enterprises at the Lakeshore Blvd. address. Dennis testified that he did not discover the address change for many months and that he assumed he had not received paper copies of Yeckley Enterprises' bank statements due to COVID-related issues with mail delivery.

{¶ 10} Although Dennis made regular deposits to, and withdrawals from, the accounts using an ATM, he could not recall whether he checked Yeckley Enterprises' account balances at the ATM or balanced its accounts in any other way during the time period it did not receive paper bank statements. Dennis testified that although a bank teller enrolled Yeckley Enterprises in online banking, he never used it and that he usually checked account balances by reviewing monthly bank statements or

that he would do so at an ATM and that if he had questions about the accounts he would go to his local bank branch.

{¶ 11} At some point — Dennis could not recall when — Dennis called the bank's 1-800 number and told a Huntington representative that Yeckley Enterprises was not receiving paper copies of its bank statements in the mail. He indicated that the representative told him to go to the Huntington branch on East 260th St. and inform them. Dennis stated that he went to the branch and spoke with the branch manager who, in turn, directed him to the Shoregate branch where Dennis and/or Yeckley Enterprises had previously conducted banking business. At the Shoregate branch Dennis spoke with a bank teller who informed him that Yeckley Enterprises' bank statements were being mailed to the Lakeshore Blvd. address. Dennis informed the teller that the Lakeshore Blvd. address was the wrong address and the teller then changed the mailing address back to the E. 270th St. address.

{¶ 12} After Dennis learned that the bank statements were being sent to the Lakeshore Blvd. address, he went to the Lakeshore Blvd. address, checked the mailbox and found some returned checks and bank statements.

{¶ 13} The bank account statement for activity in June 2021 was mailed to Yeckley Enterprises at the E. 270th St. address.

**The Account Agreement**

{¶ 14} A "Business Deposit Account Agreement" (the "account agreement") governed the relationship between Huntington and Yeckley Enterprises with respect to the accounts. There is no provision in the account agreement that specifically

references changing the mailing address on an account, only that Huntington would "[p]rovide [Yeckley Enterprises] with security alerts when you change your mailing address" and that Yeckley Enterprises was responsible for keeping its contact information up to date and to notify Huntington promptly of any change in address. The account agreement's notice provision states that "[e]xcept as otherwise provided in the Account Documents, notices we give you are effective when deposited in the U.S. mail addressed to the last address that we have for you, when made available to you through our online service, or when sent to the last known e-mail address that we have for you."

{¶ 15} With respect to "Returned Deposited Items" the account agreement states: "If we credit your Account for a deposited item, we may later deduct any amount of any item from your Account if we are unable to, or have reason to believe we will be unable to, collect the money from the applicable account holder. We may also charge you a fee if this happens and the item is returned to us unpaid."

{¶ 16} With respect to "statements" and "notices of error," the account agreement states, in relevant part:

a. Statements
We will provide you with periodic statements showing the activity on your Account through U.S. mail, or online if you choose this option. You may also request a mini-statement or an extended mini-statement at an ATM.

We will provide monthly statements if you have electronic banking transactions during the statement period. However, if your Account has a zero or positive balance and there is no activity (deposits, withdrawals, or transfers) on your Account, we may only provide a statement three months from the month in which activity last

occurred on your Account. If we classify your Account as inactive, we may stop sending statements. You agree to notify us promptly if you change your address.

b. Your Responsibility to Check for and Notify Us of Errors
Except as otherwise provided by applicable law, rules, or other Account Documents, you must notify us within 30 days after your statement is mailed or made available to you online of any errors with your Account or as soon as possible if you see an error in your transaction history online. Errors include such things as unauthorized transactions, fraudulent activity, forgeries, alterations and missing deposits.

. . .

c. How to Notify Us
You must notify us of errors by:
(1) calling us at 800-480-2001 (2265); or
(2) writing to us at:
The Huntington National Bank
Attention: Customer Service
P.O. Box 1558
Columbus, Ohio 43216

d. Our Liability if You Fail to Report Errors Timely
If you fail to notify us (i) within 30 days after your statement is mailed or made available to you or (ii) as soon as possible after discovering an error online in the transaction history, we will not be responsible for the errors and will not be required to reimburse you for them. We also will not be responsible for (i) additional error(s) by the same wrongdoer or (ii) any loss that we could have avoided if you had promptly notified us. . . .

{¶ 17} The account agreement did contain an indemnity provision pursuant to which Yeckley Enterprises agreed to indemnify and hold Huntington harmless from "any liability, loss or expense (including reasonable attorneys' fees) arising from a deposited item that is . . . returned to us for an alleged breach of warranty under applicable law or other reason not caused by us," including, "claims of: (a)

forgery; (b) unauthorized items; (c) improper endorsement; (d) alteration; (e) counterfeit items; (f) unauthorized substitute checks; and (g) illegible items."

**Yeckley Enterprises Cashes Bad Checks for Bergant**

{¶ 18} Sometime after 2018 Yeckley Enterprises began cashing checks for Jeff Bergant, the brother of a friend of Dennis' son, "to do him a favor." Dennis testified that Yeckley Enterprises did not charge interest or fees or otherwise benefit from the arrangement. Dennis stated that he cashed checks for Bergant because he was a "[n]ice guy." Dennis testified that the checks from Bergant were made payable to Dennis or Yeckley Enterprises, that Dennis would give Bergant cash for the amount of the checks and that Dennis would then deposit the checks into Yeckley Enterprises' account. Dennis testified that he later learned that "[t]hey were all bad checks." In total, Yeckley Enterprises cashed 44 checks for Bergant for approximately $16,740.

{¶ 19} With respect to the "bad checks" Dennis deposited into the accounts at issue, Dennis deposited the first such check, a check for $320, on December 15, 2020. He deposited the last such check, a check for $480, on June 23, 2021. When Bergant's bank did not pay the checks, Huntington deducted the funds that had been previously credited for the deposits from Yeckley Enterprises' account. Each such debit was identified on Yeckley Enterprises' bank account statements as a "returned deposit item." Yeckley Enterprises' bank statements for the accounts at issue show 41 "returned deposit items" totaling more than $14,000 from December 16, 2020 to

June 24, 2021.[3] Dennis claimed that he had no knowledge Bergant's checks were not clearing because (1) he was not receiving paper bank statements for Yeckley Enterprises' accounts, (2) he had never received any returned checks and (3) Huntington did not otherwise notify him that Bergant's checks had been dishonored.

{¶ 20} Dennis testified that at some point, he could not recall when, he inquired about the returned deposit items listed on Yeckley Enterprises' bank statements and a Huntington bank teller provided him with copies of all the checks Yeckley Enterprises had deposited that had been returned. Dennis stated that, at that point, he stopped cashing checks for Bergant. Huntington waived or refunded all bank fees associated with the dishonored checks.

{¶ 21} After Dennis discovered that the checks he received from Bergant had been dishonored, he contacted Bergant and they entered into a settlement agreement. On July 24, 2021, Bergant executed a cognovit note promising to pay Dennis[4] a total of $18,079.20 (consisting of principal of $16,740 and interest) in 16 monthly installments beginning in August 2021. Bergant failed to make the

---

[3] Aside from Dennis' testimony, there is nothing in the record that shows that the "returned deposit items" related to dishonored checks from Bergant. When asked whether Bergant was the only person who was writing checks to Yeckley Enterprises that were deposited into Yeckley Enterprises' accounts and later dishonored, Dennis stated that he could not recall and that "[y]ou'd have to go to the bank and get all the information." Copies of the dishonored checks were not submitted with the parties' summary judgment evidence.

[4] Although the dishonored checks were deposited into Yeckley Enterprises' account, the cognovit note was payable to Dennis.

required payments and, on February 2, 2022, Dennis filed a verified complaint in the Cuyahoga County Court of Common Pleas, Cuyahoga C.P. No. CV-22-959092, seeking judgment against Bergant on the cognovit note. In his verified complaint Dennis asserted that "[t]he purpose of said promissory note was for Defendant to guarantee restitution for all losses from a business transaction where Defendant tendered to Plaintiff forty-four (44) checks between December 19, 2019, and June 23, 2021, in exchange for cash." Judgment was entered in favor of Dennis and against Bergant in the amount of $18,079.20, plus 3 percent postjudgment interest and "Plaintiff's costs of suit and execution of judgment." Dennis testified that, as of the time of his deposition on February 28, 2023, he had not collected on the judgment.

### Yeckley Enterprises' Lawsuit Against Huntington

{¶ 22} On April 29, 2022, Yeckley Enterprises filed a complaint against Huntington in the Cuyahoga County Court of Common Pleas, Cuyahoga C.P. No. CV-22-962819. That case was voluntarily dismissed on June 2, 2023. On June 5, 2023, Yeckley Enterprises refiled its complaint, asserting claims of breach of contract and negligence against Huntington relating to the unauthorized change of address on Yeckley Enterprises' accounts. Yeckley Enterprises alleged that Huntington had breached its contract with Yeckley Enterprises by (1) changing the mailing address for Yeckley Enterprises' accounts without its authorization and (2) failing to send notice to Yeckley Enterprises of the change of address. Yeckley Enterprises further alleged that Huntington Bank had breached a duty of ordinary

care owed to Yeckley Enterprises by (1) failing to follow its own policies and procedures when it changed the mailing address on Yeckley Enterprises' accounts and (2) failing to send written notice of the change of address to Yeckley Enterprises at the proper address. Yeckley Enterprises alleged that as a result of Huntington's breach of contract and negligence, it had sustained damages in excess of $25,000.

{¶ 23} Huntington filed an answer in which it admitted that (1) from June 2020 until April 2022, Yeckley Enterprises had maintained accounts with Huntington, (2) from June 2020 through August 2020, statements for the accounts were mailed to the E. 270th St. address and (3) from September 2020 through May 2021, account statements were mailed to the Lakeshore Blvd. address. Huntington further averred that the account agreement governed the relationship between Yeckley Enterprises and Huntington. Huntington denied the remaining material allegations of the complaint and asserted various affirmative defenses.

**Huntington's Motion for Summary Judgment**

{¶ 24} On November 9, 2023, Huntington filed a motion for summary judgment. Huntington argued that it was entitled to summary judgment on Yeckley Enterprises' breach-of-contract claim because (1) Yeckley Enterprises could not prove that Huntington breached the account agreement, (2) Yeckley Enterprises could not prove that it sustained any damages resulting from Huntington's alleged breach of the account agreement and (3) Yeckley Enterprises could not prove that it had fulfilled its own obligations under the account agreement, i.e., to monitor its accounts and to promptly notify Huntington of any errors with its accounts.

Specifically, Huntington argued that "[b]ecause there is no requirement that the statements be mailed when there are other avenues to check account balances," "the mailing of the statements to a different address" was not a breach of the account agreement. Huntington contended that it had met its obligations under the account agreement by notifying Yeckley Enterprises of the change of address and making account statements available to Yeckley Enterprises online, in the bank and at an ATM. Huntington further argued that because it had refunded any fees Yeckley Enterprises had incurred as a result of the dishonored checks, "there was no action or inaction by Huntington" that had caused damage to Yeckley Enterprises and that, under the account agreement, Huntington was authorized to deduct funds previously credited to Yeckley Enterprises' account after the deposited checks were dishonored by Bergant's bank. Huntington argued that it was entitled to summary judgment on Yeckley Enterprises' negligence claim because the damages Yeckley Enterprises sought on its negligence claim were based on Huntington's alleged breach of contract and were, therefore, barred by the economic loss doctrine.

{¶ 25} In support of its motion, Huntington submitted the transcript from Dennis' deposition, an affidavit from Phebus, copies of corporate and account documents relating to Yeckley Enterprises, the account agreement, account statements, a document confirming Yeckley Enterprises was enrolled in online banking, change-of-address notices dated September 17, 2020, June 27, 2021 and June 30, 2021 and documents related to Dennis' settlement with, and subsequent lawsuit against, Bergant. In her affidavit, Phebus described the facts and

circumstances surrounding the change of address on Yeckley Enterprises' accounts and authenticated copies of Salesforce reports of interactions with Dennis and a customer due diligence report relating to her investigation of Yeckley Enterprises.[5] Phebus did not authenticate the other documents Huntington submitted with its motion for summary judgment.[6]

{¶ 26} Yeckley Enterprises opposed the motion arguing that there were genuine issues of material fact as to whether Huntington breached its contract with Yeckley Enterprises by (1) changing the mailing address on its accounts without its request or authorization and (2) failing to send notice of the change of address to

---

[5] Huntington filed the Salesforce reports, the customer due diligence report and the document confirming Yeckley Enterprises' enrollment in online banking under seal. Those documents were not included in the record forwarded to this court on appeal. Accordingly, we do not consider them here.

[6] Several of the documents Huntington submitted in support of its motion for summary judgment do not comply with Civ.R. 56(C). The materials a party may use to support or oppose a motion for summary judgment are generally limited to the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact. *See* Civ.R. 56(C). Other types of documents may be introduced as evidentiary material only through incorporation by reference in a properly framed affidavit. *See, e.g., Gurary v. John Carroll Univ.*, 2024-Ohio-3114, ¶ 35 (8th Dist.); *Professional Bank Servs. v. Grossman DT, Inc.*, 2019-Ohio-2230, ¶ 10 (8th Dist.), citing *Dzambasow v. Abakumov*, 2005-Ohio-6719, ¶ 26 (8th Dist.). Here, in footnotes in its motion for summary judgment, Huntington asserts that "true and accurate" copies of various documents, including Yeckley Enterprises' account documents, account statements, notices of change of address and account agreement were "attached" to its motion and "incorporated herein." No accompanying affidavit authenticates these documents. This does not comply with Civ.R. 56(C). However, because Yeckley Enterprises did not object to, nor move to strike, these materials, the trial court, in its discretion, was permitted to consider them in ruling on summary judgment and we may, likewise, consider them here. *See, e.g., Professional Bank Servs.* at ¶ 11-12 ("[I]f the opposing party fails to object to improperly introduced evidentiary materials, the trial court may, in its discretion, consider those materials in ruling on the summary judgment motion."); *Dzambasow* at ¶ 27.

Yeckley Enterprises. Yeckley Enterprises asserted that its duty to monitor its bank accounts did not relieve Huntington of its duties under the account agreement and that Huntington was "in the best position to prevent the damages and claims that underly this litigation." Yeckley Enterprises asserted that evidence established that Huntington, "through the admittedly inadvertent and erroneous actions of its employee Ashley Phebus," "breached its fiduciary duty of care to [Yeckley Enterprises] as its customer" and that genuine issues of material fact existed "as to Huntington's negligence relating to how and why Huntington did not contact [Yeckley Enterprises] when there were suddenly dozens of bounced checks on its business account totaling thousands of dollars." It claimed that its tort claim was "supported by evidence that Huntington breached a duty that was independent of the contract between the parties."

{¶ 27} In support of its opposition, Yeckley Enterprises submitted a (1) printout from the Ohio Secretary of State's website identifying Yeckley Enterprises as a corporation for profit since April 26, 2001 and listing Dennis, at the E. 270th St. address, under "Agent/Registrant Information," (2) an affidavit from Dennis and (3) Huntington's responses to Yeckley Enterprises' interrogatories.[7] In his affidavit, Dennis detailed the facts and circumstances relating to the operations of Yeckley Enterprises, its accounts with Huntington, the unauthorized change of address, Yeckley Enterprises' failure to receive notice of the change of address and

---

[7] The interrogatory answers did not include a verification.

Huntington's improper mailing of account statements to the Lakeshore Blvd. address beginning in September 2020.

**Trial Court's Ruling on Summary Judgment**

{¶ 28} On March 20, 2024, the trial court granted Huntington's motion for summary judgment, concluding that there were no genuine issues of material fact and that Huntington was entitled to judgment as a matter of law on Yeckley Enterprises' breach-of-contract and negligence claims. With respect to Yeckley Enterprises' breach-of-contract claim, the trial court held that "there is no evidence that Huntington did not do what [it] was required to do under the account agreement." The trial court determined that Yeckley Enterprises had failed to demonstrate a breach of contract because the account agreement required Yeckley Enterprises to "to check for and notify Huntington of any errors" associated with its accounts and that Yeckley Enterprises was notified of the "error" here, i.e., the inadvertent change of mailing address, on September 17, 2020 when the notice of the change of address was sent to Yeckley Enterprises. The trial court further found that "under the clear and unambiguous terms . . . of the account agreement," Yeckley Enterprises had until October 17, 2020 to notify Huntington of the error, that "the evidence undisputedly shows" that Yeckley Enterprises failed to do so and that "because Yeckley [Enterprises] failed to timely notify Huntington of the error, any claim that Yeckley [Enterprises] may have had against Huntington because of the error is released/waived." The trial court indicated that, even if Yeckley Enterprises did not receive paper account statements in the mail, Yeckley Enterprises had

"several readily available and accessible methods" (including online, at the bank and at the ATM) to review its account information and report any errors to Huntington.

{¶ 29} The trial court further held that even if Huntington had breached the account agreement by erroneously changing Yeckley Enterprises' mailing address, Yeckley Enterprises had failed to demonstrate "any actual damages that were actually or proximately caused by the breach." The trial court noted that Huntington had refunded any and all fees Yeckley Enterprises had been charged due to the dishonored checks and that the account agreement required Yeckley Enterprises to hold Huntington harmless for any liability, loss, or expense arising from a deposited item that was returned to Huntington. Further, the trial court stated that it appeared that Yeckley Enterprises had recouped any damages associated with the dishonored checks based on Dennis' judgment against Bergant.

{¶ 30} With respect to Yeckley Enterprises' negligence claim, the trial court held that because Yeckley Enterprises had failed to allege any negligent conduct that was "independent and separate" from any alleged breach of contract, its negligence claim was barred by the economic loss doctrine.

{¶ 31} Yeckley Enterprises appealed, raising the following three assignments of error for review:

First Assignment of Error

The trial court erred in granting Defendants-Appellees' [sic] Motion for Summary Judgment where genuine issues of material fact existed as to whether Defendant-Appellee breached the Account Agreement by unilaterally and without authorization Changing the Mailing Address for Plaintiff-Appellant's Statements.

Second Assignment of Error

The trial court erred in granting Defendant-Appellee's Motion for Summary Judgment since Plaintiff-Appellant did demonstrate it suffered actual damages caused by Defendant-Appellee's breach.

Third Assignment of Error

The trial court erred in granting Defendant-Appellee's Motion for Summary Judgment since Plaintiff-Appellant demonstrated negligent conduct independent and separate from the breach to establish a negligence claim under the Economic Loss Doctrine.

## Law and Analysis

### Standard of Review

{¶ 32} We review summary judgment rulings de novo, applying the same standard used by the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). We accord no deference to the trial court's decision and we conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶ 33} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law. *Id.* On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the

reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

**Yeckley Enterprises' Breach-of-Contract Claim**

{¶ 34} To prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant and (4) damages resulting from the breach. *See, e.g., 180 Degree Solutions LLC v. Metron Nutraceuticals, LLC,* 2021-Ohio-2769, ¶ 41 (8th Dist.); *FedEx Corp. Servs. v. Brandes Internatl. Co.*, 2020-Ohio-3449, ¶ 16 (8th Dist.).

{¶ 35} In its first assignment of error, Yeckley Enterprises contends that the trial court erred in granting summary judgment on its breach-of-contract claim because genuine issues of material fact exist as to whether (1) Huntington breached the account agreement by unilaterally changing Yeckley Enterprises' mailing address without authorization, (2) Huntington sent and/or Yeckley Enterprises received the September 17, 2020 notification of change of address, (3) the notification of change of address was sufficiently specific to put Yeckley Enterprises on notice that its mailing address had been changed to the Lakeshore Blvd. address and (4) Yeckley Enterprises' failure to review its account information and report its nonreceipt of paper statements to Huntington precluded Yeckley Enterprises from recovering for Huntington's alleged breach of contract.

{¶ 36} In its second assignment of error, Yeckley Enterprises contends that the trial court erred in concluding that Yeckley Enterprises failed to show that it

suffered actual damages as a result of Huntington's alleged breach of contract in light of (1) account statements "set[ting] forth 'Returned Deposit Items' of at least $13,530.00 [from] December 2020 through June, 2021" during the time period in Yeckley Enterprises' mailing address was improperly changed and (2) Yeckley Enterprises' assertion that it "would not have continued to cash checks had the statements been correctly provided to the correct E. 270th address."

{¶ 37} Following a thorough, independent review of the record and viewing the evidence in the light most favorable to Yeckley Enterprises, we agree with the trial court that there are no genuine issues of material fact and that Huntington is entitled to summary judgment on Yeckley Enterprises' breach-of-contract claim.

{¶ 38} In support of its claim that the trial court erred in granting summary judgment on its breach-of-contract claim, Yeckley Enterprises cites *Travelers Cas. & Sur. Co v. Washington Trust Bank,* 86 F. Supp.3d 1148 (E.D. Wash. 2015), and *DelJack, Inc. v. U.S. Bank Natl. Assn.*, 2012 U.S. Dist. LEXIS 140929 (D. Idaho Sept. 26, 2012).

{¶ 39} In *Travelers*, a bank customer's employee embezzled funds by stealing and cashing over 300 checks made payable to her employer's clients. *Washington Trust Bank* at 1151-1152. Travelers, who paid a claim to the bank customer under an insurance policy after the fraud was discovered, brought an action against the bank, alleging that the bank should not have accepted the checks because they had been signed by the employee and not the payees on the checks. *Id.* at 1152. In that case, the bank argued, among other things, that Travelers' claim was

barred because, pursuant to statute and the bank's agreement with its customer, the customer was required to examine its monthly bank statements and report unauthorized signatures or alterations within 60 days. *Id*. at 1153. The bank contended that the customer could have discovered the employee's unauthorized activity by looking at the backs of checks online, requesting copies of checks by calling the bank's customer service hotline or other measures. *Id*. The court denied the bank's motion for summary judgment concluding that there were issues of fact including whether it was reasonable for the bank to pay the checks in the manner it did and whether the checks were paid in that manner because there had been an oral agreement between the bank and the customer to allow the employee to indorse checks for the customer's clients. *Id*. at 1154-1156.

{¶ 40} In *DelJack*, the defendant bank cashed checks from its plaintiff customer that contained restrictive "For Deposit Only" indorsements, failing to honor the indorsement and, instead, "handed the cash over" to an employee of the customer "who showed up with the checks." 2012 U.S. Dist. LEXIS 140929, at * 2. Within a three-year period, the bank violated the "For Deposit Only" indorsements on 127 checks, and the customer sued the bank. *Id*. In denying the bank's motion for summary judgment, the court rejected the bank's argument that, under the account agreement, the customer was precluded from suing the bank because it failed to examine its account statements and notify the bank within 30 days of the bank's failure to deposit the "For Deposit Only" checks in accordance with their indorsements. *Id*. at *7-8, 15. The court held that those provisions of the account

agreement did not obligate the customer to notify the bank of the bank's own failure to comply with restrictive indorsements. *Id.* at \*8-15.

{¶ 41} These cases involve very different facts and do not warrant a finding that a genuine issue of material fact exists regarding Yeckley Enterprises' ability to prevail on its breach-of-contract claim. Unlike the cases cited by Yeckley Enterprises, there is no allegation here that Huntington acted improperly in its handling of the checks from Bergant.

{¶ 42} Even assuming Huntington breached the agreement by changing the mailing address without authorization and even assuming Yeckley Enterprises did not receive the September 17, 2020 change-of-address notification Huntington claimed to have mailed to the E. 270th St. address,[8] Yeckley Enterprises has not demonstrated the existence of a genuine issue of material fact as to whether it sustained any damages as a result of these alleged breaches of the account agreement.

---

[8] In its appellate brief, Yeckley Enterprises points out that "Exhibit F" to Huntington's motion for summary judgment containing the September 17, 2020 confirmation of change of address "does not include any affidavit or Civ.R. 56(C) evidence from anyone involved in preparing, printing, handling, mailing, or otherwise sending the alleged notices of address change to [Yeckley Enterprises]" and that "[n]o one has attested that the change of address was sent." Yeckley Enterprises did not raise this issue below. However, in Huntington's responses to interrogatories (which Yeckley Enterprises submitted in support of its opposition to summary judgment), Huntington stated that it acknowledged the change in address "by sending a letter to Plaintiff on September 17, 2020." The copy of the interrogatory responses Yeckley Enterprises submitted did not include a signature or verification of Huntington's answers by a corporate representative. *See* Civ.R. 33(A). Nevertheless, because no objection was raised below, the trial court could consider those responses in ruling on summary judgment.

{¶ 43} It is undisputed that Huntington refunded Yeckley Enterprises any and all fees charged as a result of the dishonored checks. Under the account agreement, Huntington is not responsible for losses resulting to a customer if the customer deposits a check that is not honored by the bank on which the check is written. Yeckley Enterprises agreed to indemnify and hold Huntington harmless from any liability, loss or expenses arising from a deposited item returned to Huntington. Yeckley Enterprises has not claimed that Huntington improperly deducted any funds from its accounts.

{¶ 44} Yeckley Enterprises has not shown that the losses it sustained as a result of cashing "bad checks" for Bergant resulted from any breach of the account agreement. Those losses occurred, not as a result of Huntington's improper change of address on Yeckley Enterprises' accounts, but because Yeckley Enterprises cashed checks for Bergant for which Bergant had insufficient funds — and continued to do so for more than six months. The address change occurred on or about September 17, 2020 — nearly three months before any of the checks at issue were deposited and dishonored. Under the terms of its account agreement with Huntington, Yeckley Enterprises was obligated to promptly review its account statements and to notify Huntington of any errors in its accounts and although Yeckley Enterprises was aware that it had not received paper copies of its account statements, Yeckley Enterprises did not review its account balances or transactions and did not promptly notify Huntington that it was not receiving paper account statements. Dennis could not recall when he first contacted Huntington about the

missing paper account statements but there is no dispute that it was only after Yeckley Enterprises had not received paper account statements for many months. The last "bad check" was deposited into Yeckley Enterprises' account more than nine months after the change in address occurred.

{¶ 45} In its appellate brief, Yeckley Enterprises asserts Huntington was "in the best position" to have avoided the harm to Yeckley Enterprises and that if "the statements [had] been correctly provided to the correct E. 270th [St.] address" Yeckley Enterprises "would not have continued to cash checks" for Bergant. However, the record does not support this claim. Based on the averments in Dennis' verified complaint in his lawsuit against Bergant, it appears that Dennis and/or Yeckley Enterprises had cashed bad checks for Bergant even before the address change occurred. In his verified complaint seeking judgment on the cognovit note, Dennis averred that "[t]he purpose of said promissory note was for Defendant to guarantee restitution for all losses from a business transaction where Defendant tendered to Plaintiff forty-four (44) checks *between December 19, 2019*, and June 23, 2021, in exchange for cash." (Emphasis added.) Even assuming all of the "returned deposit items" in Yeckley Enterprises' account statements related to dishonored checks Yeckley Enterprises received from Bergant, the account documents reflect that only 41 of the 44 checks were deposited into Yeckley Enterprises' accounts during the time period at issue, i.e., during the approximately nine months from September 2020 to June 2021 when paper account statements were sent to the Lakeshore Blvd. address.

{¶ 46} "'To recover on a breach-of-contract claim, the claimant must prove not only that the contract was breached, but that the claimant was thereby damaged.'" *Halpern v. Smith*, 2023-Ohio-1370, ¶ 31 (8th Dist.), quoting *Metro. Life Ins. Co. v. Triskett Illinois, Inc.*, 97 Ohio App.3d 228, 235 (1st Dist. 1994); *see also 180 Degree Solutions*, 2021-Ohio-2769, at ¶ 51 (8th Dist.) ("'A claimant seeking to recover for breach of contract must show damage as a result of the breach. Damages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach.'"), quoting *Corsaro v. ARC Westlake Village, Inc.*, 2005-Ohio-1982, ¶ 20-24 (8th Dist.) (plaintiff did not prove breach-of-contract damages where injury was "not the natural consequence" of the breach). Because Yeckley Enterprises has not shown that the losses it seeks to recover in this action were the result of any alleged breach of contract by Huntington, the trial court did not err in granting summary judgment in favor of Huntington on its breach-of-contract claim. Yeckley Enterprises' first and second assignments of error are overruled.

**Yeckley Enterprises' Negligence Claim**

{¶ 47} In its third assignment of error, Yeckley Enterprises argues that the trial court erred in concluding that its negligence claim was barred by the economic loss doctrine. Once again, we disagree.

{¶ 48} Under the economic loss doctrine, "a party cannot recover purely economic damages in a tort action against another party based upon the breach of contractually created duties." *B&H Res., L.L.C. v. 28925 Lorain Inc.*, 2017-Ohio-

7248, ¶ 16 (8th Dist.), citing *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 2005-Ohio-5409, syllabus. "Tort law 'is not intended to compensate parties for monetary losses suffered as a result of duties that are owed to them simply as a result of the contract.'" *B&H Res.* at ¶ 16, quoting *Digiknow, Inc. v. PKXL Cards, Inc.*, 2011-Ohio-3592, ¶ 2 (8th Dist.), citing *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 7 (1990).

{¶ 49} Yeckley Enterprises asserts that Huntington "engaged in independent and separate negligent conduct in violation of [R.C.] 1304.12" and "failed to meet this statutory obligation" to "exercise ordinary care when sending notice of a dishonored item" "by sending the notice to the wrong address." Yeckley Enterprises did not, however, include such an allegation in its complaint and did not raise this argument below. In its complaint, Yeckley Enterprises alleged that Huntington had breached its contract with Yeckley Enterprises when it changed the mailing address for Yeckley Enterprises' accounts without authorization and failed to send notice to Yeckley Enterprises of the change in address, resulting in damages. Complaint at ¶ 12-14. As to its negligence claim, Yeckley Enterprises similarly alleged only that Huntington Bank had breached a duty of ordinary care owed to Yeckley Enterprises "[b]y changing the mailing address on the [a]ccounts and failing to send written notice to [Yeckley Enterprises] at the Proper Address," resulting in damages. Complaint at ¶ 16-19.

{¶ 50} Because Yeckley Enterprises made no mention of any alleged "independent and separate" violation of a statutory obligation under R.C. 1304.12 in

its complaint or otherwise below, we will not consider that argument here. "'An appellant cannot change the theory of [its] case and present new arguments for the first time on appeal.'" *State ex rel. S.Y.C. v. Floyd*, 2024-Ohio-1387, ¶ 18, quoting *During v. Quoico*, 2012-Ohio-2990, ¶ 43 (10th Dist.); *see also Miller v. Cardinal Care Mgmt.*, 2019-Ohio-2826, ¶ 23 (8th Dist.) (a party cannot raise new arguments and legal issues for the first time on appeal; failure to raise an issue in the trial court waives that issue for appellate purposes), citing *Cleveland Town Ctr. L.L.C. v. Fin. Exchange Co. of Ohio, Inc.*, 2017-Ohio-384, ¶ 21 (8th Dist.); *Wolk v. Paino*, 2011-Ohio-1065, ¶ 36 (8th Dist.) ("Generally, a plaintiff cannot enlarge [its] claims during a defense to a summary judgment motion and is limited to the allegations of [its] pleading.").

{¶ 51} The economic damages Yeckley Enterprises seeks to recover on its negligence claim — damages allegedly resulting from Huntington's change of address on Yeckley Enterprises' accounts and Yeckley Enterprises' alleged nonreceipt of the change-of-address notice — are the same economic damages Yeckley Enterprises seeks to recover on its breach-of-contract claim arising out of Huntington's alleged breach of the account agreement. Accordingly, the trial court properly concluded that Yeckley Enterprises' negligence claim was barred by the economic loss doctrine and did not err in granting summary judgment in favor of Huntington on Yeckley Enterprises' negligence claim. Yeckley Enterprises' third assignment of error is overruled.

{¶ 52} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)